UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

F. HOFFMANN-LA ROCHE LTD., ROCHE          :
MOLECULAR SYSTEMS, INC., and
GEN-PROBE INC.,                           :

                                                09 Civ. 7326 (WHP)
                        Petitioners,      :     09 Civ. 7396 (WHP)

        -against-                         :     MEMORANDUM & ORDER

QIAGEN GAITHERSBURG, INC.,                :

                        Respondent.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #:                      │
│ DATE FILED: 8/11/2010       │
└─────────────────────────────┘
```

WILLIAM H. PAULEY III, District Judge:

        Petitioners F. Hoffmann-La Roche Ltd., Roche Molecular Systems, Inc.

(collectively "Roche") and Gen-Probe, Inc. ("Gen-Probe") bring this action to confirm a final

international arbitration award dated August 12, 2009 in ICDR Case No. 50 181 00502 06,

Digene Corporation, Claimant v. F. Hoffmann-La Roche Ltd. and Roche Molecular Systems,

Inc., and Gen-Probe Incorporated, Respondents (the "Final Award"). Respondent Qiagen

Gaithersburg, Inc. ("Qiagen"), as successor in interest to arbitration claimant Digene Corporation

("Digene"), cross-petitions to vacate the Final Award. For the following reasons, Petitioners'

motion to confirm the Final Award is granted, and Qiagen's motion to vacate is denied.

## BACKGROUND

        F. Hoffmann-La Roche Ltd. is a Swiss limited-liability company with its principal

place of business in Basel, Switzerland. Roche Molecular Systems Inc., a wholly-owned

subsidiary of F. Hoffmann-La Roche Ltd., and Gen-Probe are both Delaware corporations with

their principal places of business in California. Qiagen is a Delaware corporation headquartered

in Maryland. Each of these companies designs, manufactures, and markets diagnostic and

therapeutic healthcare products. The underlying arbitration concerned a dispute over certain

patent rights contained in a Cross-License Agreement (the "Cross-License Agreement" or

"CLA") signed by predecessors in interest to Roche and Qiagen.

    A. The Cross-License Agreement

        In April 1990, Life Technologies, Inc ("LTI") and the Institut Pasteur ("IP")

entered into the Cross-License Agreement, under which the parties granted to one another

various licenses for human papilloma virus ("HPV")—the virus which causes cervical cancer—

patents, patent applications, and virus types. (Declaration of Peter J. Macdonald dated Oct. 7,

2009 ("First Macdonald Decl.") Ex. 2: Cross-License Agreement between Life Technologies,

Inc. and Institut Pasteur dated Apr. 1, 1990 ("CLA").) The Cross-License Agreement allowed

LTI and IP to exploit the HPV licenses commercially and to develop tests for diagnosing HPV.

(First Macdonald Decl. Ex. 1: International Centre for Dispute Resolution Final Award of

Arbitrators dated Aug. 12, 2009 ("Final Award") Ex. A: International Centre for Dispute

Resolution Interim Award of Arbitrators dated Mar. 31, 2009 ("Interim Award") at 6.)

        Digene succeeded to LTI's interest in the Cross-License Agreement, and, in turn,

Qiagen succeeded to Digene's interest. (Interim Award at 1.) As Digene's successor, Qiagen

currently markets the only Food-and-Drug-Administration-approved test for the detection of

HPV. (Declaration of James G. McCarney in Support of Qiagen's Petition to Vacate dated Oct.

7, 2009 ("First McCarney Decl.") Ex. 15: Demand for Arbitration dated Dec. 4, 2006 ("First

Demand") at 1.) Roche is the successor in interest to IP. (Interim Award at 1.)

The first sections of the Cross-License Agreement contain reciprocal license grants allowing each party "the non-exclusive, paid-up, world-wide right and license to use [the other party's] Patent Rights and . . . Virus Types with rights to develop, make and have made, use, sell, market and otherwise commercially exploit products and services. . . ." (CLA at 3.) The Cross-License Agreement also contains covenants against further licensing by the grantors or sublicensing by the grantees of the covered patents, unless specifically permitted in the Cross-License Agreement. (CLA at 3-4.) Under Section 11 of the agreement, "a dispute or controversy between the parties rising out of this Agreement" that cannot be settled between the parties "shall be submitted to arbitration pursuant to the Rules of the American Arbitration Association (the 'AAA')." (CLA at 11.) Section 10 provides that "[the] agreement shall be governed by and construed in accordance with the laws of the State of New York." (CLA at 11.)

### B. The Present Dispute

On February 15, 2005, Roche entered into a Supply and Purchase Agreement (the "Supply Agreement" or "SPA") with Gen-Probe. (First McCarney Decl. Ex. 6: Supply and Purchase Agreement dated Feb. 15, 2005 ("SPA").) Under the Supply Agreement, Roche manufactures and delivers oligonucleotide ("oligo") probes and HPV transcripts to Gen-Probe. (SPA at 4.) Oligo probes are sequences of nucleic acids designed to bind with the nucleic acid sequences of certain HPV types. Although manufactured by Roche, the sequences in the oligo probes were designed by Gen-Probe. (Interim Award at 9.) After manufacturing, Roche purifies and analyzes the probes, packages them, and ships them to Gen-Probe. (Interim Award at 9.) Finished probes are incorporated into Gen-Probe's HPV Transcription-Mediated Amplification ("TMA") test kit. (Interim Award at 9.) The Supply Agreement requires Gen-Probe to use the

-3-

probes in finished HPV-TMA-diagnostic kits and prohibits Gen-Probe from manufacturing HPV oligo probes or reselling Roche's probes. (SPA at 4.)

On December 4, 2006, Digene instituted arbitration proceedings against Roche alleging that entering the Supply Agreement with Gen-Probe constituted a breach of the Cross-License Agreement. (Demand at 8-9.) Digene filed its arbitration demand against Roche at the International Centre for Dispute Resolution ("ICDR"), a division of the AAA. Digene alleged two separate breach of contract claims: first, Roche impermissibly provided Gen-Probe with "products" in violation of Section 1 of the Cross-License Agreement; and, second, Roche granted Gen-Probe a sublicense in violation of Section 2 of the agreement. (Demand at 8.)

On June 18, 2007, Gen-Probe petitioned to intervene in the Digene-Roche arbitration, which Digene opposed on the grounds that Gen-Probe was not a signatory to the Cross-License Agreement. (First Macdonald Decl. Ex. 3: Order Granting Gen-Probe's Petition to Participate as a Party to the Digene/Roche Arbitration dated July 13, 2007 ("Participation Order") at 2.) The ICDR panel of three arbitrators (the "Panel") found that "Gen-Probe [had] an enforceable legal right to participate . . . to assert defenses, and protect interests, that [were] intimately founded in and intertwined with the underlying contract issues arising under the [Cross-License Agreement] between Digene and Roche," and granted Gen-Probe's motion to intervene. (Participation Order at 3-4.) Digene amended its arbitration demand to assert a tortious interference with business relations claim against Gen-Probe. (Declaration of Jmaes G. McCarney in Opposition dated Nov. 6, 2009 ("Second McCarney Decl.") Ex. R: First Amended Demand for Arbitration dated Aug. 27, 2007 ("First Amended Demand") at 8.)

In February 2008, Digene moved to amend its petition a second time to assert a new tortious interference claim against Roche and a claim that IP's assignment of rights under the Cross-License Agreement to Roche was invalid. (Second McCarney Decl. Ex. O: Digene Corp.'s Motion for Leave to File Second Amended Arbitration Demand dated Feb. 29, 2008 at 2.). On April 4, 2008, the Panel granted Digene leave to add the tortious interference claim but denied leave with respect to the assignment of rights claim. The Panel explained that Digene had notice of the assignment for months and an amendment at that stage of the proceeding could be prejudicial to Roche and Gen-Probe. (First Macdonald Decl. Ex. 5: Preliminary Hearing Order dated Apr. 4, 2008 ("Preliminary Hearing Order") at 2.) However, the Panel's ruling was "without prejudice" and was "not meant to limit any of the arguments that the parties may make, or the evidence they may proffer, which may touch upon the subject matter of Digene's motion." (Preliminary Hearing Order at 2.)

C. The Arbitration Panel Awards

Over the course of two weeks in October and November 2008, the Panel heard testimony from sixteen witnesses and received 254 exhibits into evidence. (Interim Award at 2.) After offering the parties the opportunity to submit further testimony and evidence—which they declined— the Panel received extensive post-hearing briefs from the parties and heard closing arguments on January 30, 2009. (Interim Award at 2.) On March 31, 2009, the Panel unanimously rendered the Interim Award, dismissing Digene's claims against both Roche and Gen-Probe. (Interim Award at 31.)

The Panel first rejected Digene's argument that preclusive effect must be given to an earlier ICDR arbitration award titled Digene Corporation v. Beckman Coulter, Inc. (the

"Beckman Arbitration"), finding, among other things, that the Beckman Arbitration had a different "roster of parties" and dealt with distinct issues. (First McCarney Decl. Ex. 1: Award in ICDR Case No. 50 133 T 00002 05, Digene Corporation v. Beckman Coulter, Inc.,. dated July 27, 2006; Interim Award at 6 n.3.)

The Panel then addressed Digene's claim that Roche impermissibly provided Gen-Probe with "products" that Roche was not authorized to sell under Section 1 of the Cross-License Agreement. (Interim Award at 10-13.) Digene contended that the "products" Roche was authorized to make and sell, as successor to IP's rights under the Cross-License Agreement, included only finished diagnostic tests and kits for end users, not intermediate component parts like oligo probes. (Interim Award at 11.) Roche averred that "products" was to be broadly defined. Applying New York and federal law, the Panel concluded that the term "product" should be given "its ordinary plain meaning, i.e. 'something produced.'" (Interim Award at 11 (quoting Webster's Collegiate Dictionary (10th ed. 2001)).) The Panel held that Roche did not breach the license grant by selling oligo probes to Gen-Probe because "the oligo probes [were] 'products' permitted to be sold and commercially exploited under [Section 1 of the Cross-License Agreement]." (Interim Award at 12-13.)

Further, the arbitrators found that even if the oligo probes were not "products," the Cross-License Agreement does not prohibit "sales or marketing of HPV-related materials not encompassed by that term." (Interim Award at 13 (emphasis in original).) The Panel determined that the Supply Agreement's provisions restricting post-sale use of the oligo probes, requiring that Gen-Probe mark its kits with certain patent information, and containing certain warranties by both parties were not "a license . . . to Gen-Probe." (Interim Award at 13; SPA at 4, 13-14.) The

-6-

arbitrators reasoned that the post-sale restrictions prevented Gen-Probe from obtaining a license, that the patent marking provision ensured full compliance with the Cross-License Agreement and with federal law, and that the warranty provisions were similar to those in other sale of goods contracts. (Interim Award at 14-16.) The Panel found that the Supply Agreement "has a clear commercial purpose" involving the sale, and not the manufacture, of patented products by Gen-Probe. (Interim Award at 13, 16.) Thus, it was determined that Digene did not show that "the overall effect of the SPA [was] a license, rather than a bona fide supply and purchase agreement." (Interim Award at 14.)

The Panel also rejected Digene's tortious interference claim against Roche because Digene never cultivated more than a "superficial" business relationship with Gen-Probe and negotiations between the companies "ended quickly." (Interim Award at 22-25.) Further, the evidence did not show that Roche knew of any details of this relationship between Digene and Gen-Probe. (Interim Award at 25-26.) Finally, the Panel dismissed Digene's tortious interference claim against Gen-Probe, concluding that "a party cannot commit the tort of inducing a breach of contract unless the conduct allegedly induced constituted a breach of the underlying agreement." (Interim Award at 27.)

After issuing the Interim Award, the Panel received additional briefing and heard argument on Roche and Gen-Probe's applications for attorneys' fees and costs. (Final Award at 3.) On August 12, 2009, the Panel issued its Final Award, which incorporated the Interim Award and assessed fees and costs against Digene. In a thorough opinion, the Panel found it possessed authority to award fees under Article 31 of the ICDR Rules because the Cross-License Agreement's arbitration clauses incorporated a fee-shifting provision. Moreover, Digene

-7-

submitted to the Panel's authority to award fees by repeatedly demanding attorneys' fees in its

arbitration papers. (Final Award at 3-21.) The Panel awarded Gen-Probe fees, despite its

intervenor status, because Digene named Gen-Probe as a defendant and because Gen-Probe's

participation was "neither redundant nor unnecessary." (Final Award at 22-23.) The Panel

disallowed $90,812.50 in fees requested by Gen-Probe, however, because Gen-Probe had forced

the relitigation of some issues. (Final Award at 23-24.) In total, the Panel awarded attorneys'

fees, costs, and ICDR fees in the amount of $3,157,729.30 to Roche and $2,954,261 to Gen-

Probe. The Panel also assessed against Digene over $715,000 in fees and expenses incurred by

the ICDR and the Panel. (Final Award at 29.)

On August 13, 2009, Qiagen filed a petition under N.Y. C.P.L.R. § 7511 to vacate

or modify the Final Award in New York State Supreme Court. On August 20, 2009, Roche and

Gen-Probe filed a petition in this Court (No. 09 Civ. 7326) to confirm the Final Award under the

Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958

(the "Convention"). See 21 U.S.T. 2517, 330 U.N.T.S. 38. On August 21, 2009, Roche and

Gen-Probe removed Qiagen's state court action to this Court (No. 09 Civ. 7396). Without

objection, the cases were consolidated as related.

DISCUSSION

I.   Jurisdiction & Standard of Review

The parties implicitly dispute which standards govern this Court's review of the Final Award.  Qiagen, whose petition originated in state court, moves to vacate the Final Award under New York law, specifically N.Y. C.P.L.R. § 7511.  Roche and Gen-Probe invoke the jurisdiction of and standards set forth in the Convention and codified in the Federal Arbitration Act ("FAA") at 9 U.S.C. §§ 201-08.

Federal courts do not have jurisdiction to review every arbitration award.  See Hall Street Assoc., LLC v. Mattel, Inc., 552 U.S. 576, 581-82 (2008).  While review of domestic awards under the FAA requires an "independent jurisdictional basis," confirmation or vacatur of nondomestic or "international" awards under the New York Convention does not.  Compare Hall Street, 552 U.S. at 581-82 ("As for jurisdiction over controversies touching arbitration, the Act does nothing, being 'something of an anomaly in the field of federal-court jurisdiction' in bestowing no federal jurisdiction but rather requiring an independent jurisdictional basis.") with 9 U.S.C. § 203 ("An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States.").

With respect to awards under the Convention, the FAA provides that on the application of a party to an arbitration award, a district court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."  9 U.S.C. § 207; see Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 18-19 (2d Cir. 1996).  By its terms, the Convention applies to any arbitral awards "not considered as domestic awards in the State where their recognition and

enforcement are sought." N.Y. Convention, art. I(1). Although what constitutes a

"nondomestic" award is not defined in the Convention, see Yusuf, 126 F.3d at 18-19, Section

202 of the FAA sets forth a broad definition for nondomestic awards over which district courts

have subject matter jurisdiction:

> An arbitration agreement or arbitral award arising out of a legal
> relationship, whether contractual or not, which is considered as
> commercial, including a transaction, contract, or agreement
> described in section 2 of this title, falls under the [New York]
> Convention.   An agreement or award arising out of such a
> relationship which is entirely between citizens of the United States
> shall be deemed not to fall under the Convention unless that
> relationship involves property located abroad, envisages
> performance or enforcement abroad, or has some other reasonable
> relation with one or more foreign states.

9 U.S.C. § 202; see also Jain v. de Mere, 51 F.3d 686, 688-89 (7th Cir. 1995).

Although three of the four parties to the underlying dispute are American and the

arbitration took place in New York, this matter is "international" within the meaning of the

Convention. Notably, the arbitration concerned a commercial dispute over certain HPV patents

registered in the Europe, Asia, and the United States. The coverage of these patents is clearly

beyond the borders of the United States. Because Section 202 classifies only disputes "entirely"

between United States citizens as domestic, Congress intended the Convention to cover

arbitrations like this one. See, e.g., Zeiler v. Deitsch, 500 F.3d 157, 164 (2d Cir. 2007) (finding

commercial dispute between United States and Israeli parties under Hebrew law to fall under the

New York Convention); Pike v. Freeman, 266 F.3d 78, 85 n.4 (2d Cir. 2001) (Sotomayor, J.)

(reiterating standard that the dispute not be "entirely domestic in scope.").

The Convention sets forth seven grounds on which confirmation of an award may

be denied. 9 U.S.C. § 207 (incorporating N.Y. Convention, arts. V(2)(b) & V(1)); see also

-10-

Telenor Mobile Comm'cns AS v. Storm LLC, 584 F.3d 396, 405 & n.4 (2d Cir. 2009) (reciting the seven standards). However, because the Final Award was entered in New York, the domestic provisions of the FAA, to the extent they vary from the Convention's terms, must also be considered. See Zeiler, 500 F.3d at 164-65 (finding no practical effect in review of an international arbitration award where district court failed to consider FAA standards); Yusuf Ahmed, 126 F.3d at 21-23 ("We read Article V(1)(e) of the Convention to allow a court in the country under whose law the arbitration was conducted to apply domestic arbitral law, in this case the FAA, to a motion to set aside or vacate that arbitral award."). Neither party invoked any of the seven vacatur standards set forth in the Convention. Rather, each relied exclusively on the FAA's domestic provisions under § 10(a), the standards in the CPLR, and the federal courts "judicial gloss" on both.

Under the FAA, a court may vacate an arbitration award where: (1) the award was procured by corruption, fraud, or undue means; (2) there was evident partiality or corruption in the arbitrators; (3) the arbitrators were guilty of misconduct in refusing to postpone the hearing or refusing to hear evidence pertinent to the controversy, or of any other misbehavior by which the rights of any party have been prejudiced; or (4) the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. 10 U.S.C. § 10(a); see also InterDigital Comm'cns Corp. v. Nokia Corp., 407 F. Supp. 2d 522, 528 (S.D.N.Y. 2005); United House of Prayer for All People v. L.M.A. Int'l, Ltd., 107 F. Supp. 2d 227, 230 (S.D.N.Y. 2000) ("[C]ourts often hold that the 'appearance of impropriety' may not be sufficient to vacate an award under the FAA, while under CPLR 7511(b), as construed by the New York courts, the appearance of impropriety may

-11-

be a sufficient or critical factor in vacating arbitration awards."). But see Wien & Malkin LLP v. Helmsley-Spear, Inc., 846 N.E.2d 1201, 1206-07 (N.Y. 2006) (applying FAA standard to intrastate dispute between two litigants in New York City).

        Regardless of the statutory scheme adopted, courts in this Circuit continue to employ the "manifest disregard of the law" standard in determining whether to vacate an award. See Stolt-Nielsen v. AnimalFeeds Int'l Corp., 548 F.3d 85, 91 (2d Cir. 2008), reversed on other grounds 130 S.Ct. 1758, 1767-68 & n.3 (2010).

## II. Qiagen's Motion to Vacate

        Qiagen invokes several grounds for vacating or modifying the Final Award—(1) the Panel manifestly disregarded the law by (a) ignoring the collateral estoppel effect of a prior arbitration and (b) allowing Gen-Probe's intervention; (2) the Panel exceeded its powers and disregarded the law in awarding attorney's fees; and (3) the Panel improperly refused to hear evidence and decide material issues.

### A. Manifest Disregard of the Law

        A party seeking to vacate an award on the basis of the arbitrator's alleged "manifest disregard" of the law bears a "heavy burden." Stolt-Nielsen, 548 F.3d at 91 (citing GMS Group, LLC v. Benderson, 326 F.3d 75, 81 (2d Cir. 2003)); Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp., 103 F.3d 9, 12 (2d Cir. 1997). A court's review on a manifest disregard challenge is "severely limited," primarily because it is "highly deferential to the arbitral award." Stolt-Nielsen, 548 F.3d at 91-92 (noting that vacatur is allowed "only in those exceedingly rare instances where some egregious impropriety on the part

-12-

of the arbitrators is apparent"). A court should enforce an award as long as "there is a barely
colorable justification for the outcome reached," even where "[the court] is convinced that the
arbitration panel made the wrong call on the law." Stolt-Nielsen, 548 F.3d at 92-93 (manifest
disregard means more than "error or misunderstanding with respect to the law" (internal citations
omitted)).

Courts in this Circuit employ a three-part inquiry to determine if an arbitration
award was in "manifest disregard":

> (1) Whether the law that was allegedly ignored was clear and
> explicitly applicable to the matter before the arbitrators;
>
> (2) Whether the law was, in fact, improperly applied, leading to
> an erroneous outcome; and
>
> (3) Whether the arbitrators actually possessed knowledge of the
> law and its applicability to the dispute.

Stolt-Nielsen, 548 F.3d at 93. In essence, to justify vacatur, the arbitrator "must appreciate the
existence of a clearly governing legal principle but decide to ignore or pay no attention to it."
InterDigital, 407 F. Supp. at 529; see also Westerbeke Corp. v. Daihatsu Motor Co., 304 F.3d
200, 209 (2d Cir. 2002)).

### 1. The Beckman Arbitration

Qiagen asserts that the Panel disregarded the collateral estoppel effect of the
ICDR Beckman Arbitration. "An arbitration decision may effect collateral estoppel in a later
litigation or arbitration if the proponent can show 'with clarity and certainty' that the same issues
were resolved." Bear, Stearns & Co. v. 1109580 Ontario, 409 F.3d 87, 91 (2d Cir. 2005)
(quoting Postlewaite v. McGraw-Hill, Inc., 333 F.3d 42, 49 (2d Cir. 2003)). A party is
collaterally estopped if "(1) the identical issue was raised in a previous proceeding; (2) the issue

-13-

was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." Bear, Stearns, 409 F.3d at 91 (citation and quotation marks omitted).

The Beckman Arbitration arose out of a patent lawsuit filed in 2001 in the District of Delaware titled Digene Corp. v. Ventana Medical Systems, Inc., 484 F. Supp. 2d 274 (D. Del. 2007). As in this litigation, the issue in Ventana concerned the meaning of a "product" or "service" under the Cross-License Agreement—specifically, whether "cell paste" was a product and, therefore, saleable. The district court in Ventana summarized the history that led to the Beckman Arbitration:

> Pursuant to the CLA, LTI cross-licensed its HPV patents to IP and subsequently permitted IP to sublicense Beckman Coulter, Inc. ("Beckman"). In June 1991, under the Sublicensing Agreement ("SLA"), IP sub-licensed its rights obtained in the CLA to Beckman. In the mid-1990s, Ventana began selling HPV products manufactured from cell paste acquired from Beckman. In September 2002, Ventana allegedly acquired Beckman's rights in the CLA and SLA through an Asset Purchase Agreement ("APA"). Beckman and Ventana also executed a Side Letter Agreement which afforded Beckman the opportunity to buy cell paste from Ventana and to make probes.
>
> Digene initially filed suit against Ventana in November 2001. Following the APA between Ventana and Beckman in 2002, Digene amended its complaint and added Beckman as a defendant. In May 2004, the court ordered Digene to arbitrate all of its claims against Beckman arising out of the CLA before the International Centre for Dispute Resolution ("ICDR") and stayed the proceedings against Ventana.

Ventana, 484 F. Supp. 2d at 276-77 n.1-2. Following the court's order, Digene and Beckman commenced the Beckman Arbitration. At that point, Ventana moved to intervene in the

arbitration, which Digene successfully opposed. Ventana, 484 F. Supp. 2d at 281-82. The

Beckman Arbitration panel concluded, in favor of Digene, that cell paste was not a product under

the Cross-License Agreement and, therefore, could not be sold without violating the agreement.

Thereafter, Ventana assigned its rights in the Cross-License Agreement to Roche.

                Given the similarities between the Beckman Arbitration and the arbitration here,

had the Panel ignored Beckman or even questioned its conclusions, this Court would have

serious reservations about the validity of the Final Award. Yet, even a cursory review of the

Final Award shows that this hypothetical—which Qiagen attempts to recast as reality—is beyond

the pale. The Panel notes in the Final Award that Digene repeatedly referenced the Beckman

Arbitration, even requesting the same ICDR panel hear this matter. Further, in the Interim

Award, the Panel explicitly addressed and rejected Qiagen's collateral estoppel argument:

> At various times, the parties argued the relevancy of other
> proceedings, such as the French ICC arbitration and the prior
> ICDR [Beckman Arbitration]. . . . [T]he Panel notes that neither of
> those cases had the same roster of parties present here, that the
> witnesses and evidentiary record presented here differed in
> material respects from the earlier cases, and that the particular
> issues for decision in the present case differ significantly.

(Interim Award at 6 n.4.) In determining that the Beckman Arbitration did not preclude

Digene's claims here, the Panel heard arguments concerning the prior arbitrations, recognized

the applicable law, and came to a reasoned conclusion distinguishing the underlying arbitration

from Beckman. This is far from disregard. Notably, the Panel found that two of the four criteria

for collateral estoppel—identical issues and actual litigation by a party—were absent. See Bear,

Stearns, 409 F.3d at 91. Any court considering the issue would have employed identical

reasoning. Moreover, even if the Panel erred in its collateral estoppel analysis, it is not manifest

-15-

disregard where the arbitrators recognize the appropriate governing standard but then erroneously apply that standard to the facts before them. See Matter of Arbitration Between Smithkline Beecham Biologicals, S.A. v. Biogen, Inc., No. 95 Civ. 4988 (JGK), 1996 WL 209897, at *4-6 (S.D.N.Y. Apr. 29, 1996) (finding no manifest disregard where the "arbitration panel found that the issues before it were not identical to those presented to the [previous] panel. There was no manifest disregard of New York law . . . in so finding—indeed, there is not even an arguably erroneous application of New York law." (emphasis added)).

In addition, the Panel's decision is hardly controversial given that Roche's predecessor in interest—Ventana—was not permitted to intervene in the Beckman Arbitration. Notably, it was Digene who successfully opposed Ventana's petition by arguing that Ventanta had no direct interest in the arbitration. See Ventana, 484 F. Supp. 2d at 281-282. Qiagen's attempt to exalt Beckman is unavailing. That arbitration is clearly distinct from this one, and the Panel's reasoned decision should have laid that question to rest. But, as this Court has noted before, parties on the losing end of international arbitrations rarely accept the conclusions of an arbitration panel as final. See InterDigital, 407 F. Supp. 2d at 525-26 ("This action presents the all too common denouement of international arbitrations—relitigation in federal court."). But, an arbitration panel's conclusions are more than advisory opinions for the federal courts—rather, they are thoughtful analyses made by adjudicators steeped in the facts and law. As the FAA makes clear, any judicial review must take this into account.

Finally, the Panel did not exceed its powers in finding that the Beckman Arbitration had no preclusive effect. "[A]n adjudicator is generally accorded 'broad discretion' in determining whether or not collateral estoppel should apply in a given case." Bear, Stearns,

-16-

409 F.3d at 91-92 (quoting Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331 (1979)).  The Panel recognized it had the authority to apply collateral estoppel but determined the requisite predicates were lacking.  Accordingly, the Panel acted within its authority.  See Bear, Stearns, 409 F.3d at 90-92 ("[T]he arbitrators had discretion to apply collateral estoppel or not.").

### 2.  The Gen-Probe Intervention

Qiagen renews its objection to Gen-Probe's intervention on the grounds that Gen-Probe was a non-signatory to the Cross-License Agreement.  Qiagen asserts that the Panel's decision to permit intervention was in manifest disregard of the law and that this Court should conduct a de novo review.

The Court of Appeals recognizes many circumstances in which a signatory and a non-signatory to an arbitration agreement may be compelled to arbitrate their dispute.  See Choctaw Generation Ltd. v. Am. Home Assur., 271 F.3d 403, 406 (2d Cir. 2001); Smith/Enron Cogeneration v. Smith Cogeneration, 198 F.3d 88, 97-98 (2d Cir. 1999);  Thompson-CSF S.A. v. Amer. Arbitration Ass'n, 64 F.3d 773, 776-78 (2d Cir. 1995).  In Thompson-CSF, the Court of Appeals recounted five theories, following from the "ordinary principles of contract and agency," for binding non-signatories to arbitration agreements—1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.  See 64 F.3d at 776.

Expounding on the estoppel justification, the Thompson-CSF court delineated two distinct estoppel theories.  First, and most commonly, are instances where a signatory attempts to bind a nonsignatory to arbitration.  See Smith/Enron, 198 F.3d at 98 ("The more typical case, as we have already noted, arises when a signatory to an arbitration agreement seeks to bind a non-signatory to it.") (citing Am. Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353

-17-

(2d Cir. 1999); Deloitte Noraduit A/S v. Deloitte Haskins & Sells, 9 F.3d 1060, 1064 (2d Cir. 1993)). A nonsignatory is bound "when it has derived other benefits under the agreement containing the arbitration clause." Smith/Enron, 198 F.3d at 98. Conversely, a nonsignatory may estop a signatory from avoiding arbitration "when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." Smith/Enron, 198 F.3d at 98 (emphasis added) (citing Thompson-CSF, 64 F.3d at 779); see also Choctaw, 271 F.3d at 406 ("[T]his Court did apply that reasoning to compel a party that signed a contract containing an arbitration clause to arbitrate with a non-signatory. We think that the present controversy is of the kind that justified arbitration . . . but that such a conclusion requires careful justification."). In considering how "intertwined" the issues for arbitration are, a court should consider "the relationship between the parties, the contracts they signed, and the issues that arose between them." Astra Oil Co., Inc. v. Rover Navigation, Ltd., 344 F.3d 276, 279-80 (2d Cir. 2003).

         The Panel fully recognized this established line of Second Circuit precedent when reviewing and granting Gen-Probe's application to intervene. In its decision, the Panel traced the case law, appreciated the inherently "fact-specific" nature of the intervention inquiry, and came to a consensus that "Gen-Probe's application has demonstrated the requisite extent of 'intertwined-ness' to warrant granting its motion to intervene under the applicable Second Circuit authorities." Given that the central issues for arbitration concerned Roche's relationship with Gen-Probe, the Panel's result is neither surprising nor erroneous. The Panel explained that the inclusion of such "intimately founded" claims would allow the parties to avoid the "procedural morass" that the Ventana litigation and Beckman Arbitration spawned. Further,

-18-

because arbitration agreements serve to "settl[e] disputes efficiently and avoid[] long and expensive litigation," Willemijn, 103 F.3d at 12, the Panel's decision served the overarching goals of the arbitration agreement—saving the parties and the Panel the time and cost of litigating separate proceedings.

Moreover, Gen-Probe's intervention did not prejudice Digene. Rather, the Panel afforded it a full opportunity to present its claims against Roche, and the Panel's Final Award addressed Digene's claims against Roche and Gen-Probe separately. Qiagen's newfound claims of unfairness are particularly dubious given that Gen-Probe chose not to pursue any counterclaims during the arbitration and, thus, was present solely to defend itself. See Interim Award at 3 ("Although Roche and Gen-Probe asserted counterclaims in the referenced pleadings, they were not addressed during the arbitration and were not raised in post-hearing briefs or argument. . . . [C]ounsel for both Roche and Gen-Probe conceded that they were not pursuing those counterclaims.").

For these reasons, even accepting Qiagen's last-minute assertion at oral argument that a de novo review is required, this Court concurs fully with the conclusions reached by the Panel. Accordingly, Gen-Probe's intervention provides no cause to vacate the Final Award.

B. Power to Award Attorneys' Fees

Section 10(a)(4) of the FAA provides that a court may vacate an arbitral award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." Qiagen asserts that the Panel exceeded its powers and disregarded the law by awarding Roche and Gen-Probe attorneys' fees for fending off Digene's claims.

-19-

Arbitration "is a matter of contract," and the FAA "requires courts to enforce [arbitration agreements] according to their terms." Rent-A-Center, West, Inc. v. Jackson, 130 S. Ct. 2772, 2776 (2010). By definition, an arbitrator's powers are derived from and defined by the arbitration agreement at issue. See Hall Street, 552 U.S. at 586-87 ("[T]he FAA lets parties tailor some, even many features of arbitration by contract, including the way arbitrators are chosen, what their qualifications should be, which issues are arbitrable, along with procedure and choice of substantive law."). In this Circuit, an arbitration panel exceeds its authority, within the meaning of FAA § 10(a)(4), when it exercises a power it was not delegated or reaches conclusions on issues not submitted by the parties. See Stolt-Nielsen, 548 F.3d at 101; DiRussa v. Dean Witter Reynolds, Inc., 121 F.3d 818, 824 (2d Cir. 1997) ("Our inquiry . . . focuses on whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue."). Moreover, a panel exceeds its powers when it manifestly disregards law. See Stolt-Nielsen, 548 F.3d at 101.

In this dispute, the Panel had several legitimate bases of authority to award attorneys' fees. First, the rules governing the arbitration allowed for fees. Section 11 of the Cross-License Agreement directed that the arbitration be conducted "pursuant to the rules of the American Arbitration Association." Those rules include the ICDR provisions which governed the arbitration. ICDR Article 31 plainly allows for attorney's fees and costs to the successful party:

> The tribunal shall fix the costs of arbitration in its award. The tribunal may apportion such costs among the parties if it determines that such apportionment is reasonable, taking into account the circumstances of the case.
>
> Such costs may include:
> (a) the fees and expenses of the arbitrators; [and]
> . . .
> (d) the reasonable costs for legal representation of a successful party.

See Int'l Dispute Resolution Proc., at http://www.adr.org/sp.asp?id=33994#16.%20Expenses.  In

the Final Award, the Panel invoked Article 31 as one source of its authority to award fees,

rejecting Qiagen's argument that the ICDR Rules did not apply:

> The Panel notes that Digene voluntarily filed its original Demand for Arbitration with the ICDR, as well as each of its subsequent demands.  In fact, Digene sought to have this arbitration heard by the same ICDR panel that heard the Beckman arbitration.  Further, Digene invoked the ICDR Rules throughout the arbitration.

See Final Award at 14.

Although Qiagen now objects to the fee award, it was its predecessor in interest

Digene which specifically requested an award of fees in its "Prayer for Relief."  See Demand at

10.  Moreover, after Gen-Probe intervened, Digene reformed its pleadings to make a broad

demand for damages and costs against Gen-Probe—pursuing the intervenor in the same manner

as it did Roche.  Thus, even if the Cross-License Agreement was silent on the issue of fees,

Digene "acquiesced" to the Panel's power to award fees through its actions at the arbitration.

See Spector v. Torenberg, 852 F. Supp. 201, 210, 211 (S.D.N.Y. 1994) (citing Synergy Gas Co.

v. Sasso, 853 F.2d 59, 64 (2d Cir. 1988)).

In addition, the Final Award painstakingly considered the applicability of Article

31, the American Rule on fees, and relevant case law.  The Panel reasonably concluded that the

-21-

New York choice of law provision applied only to the law governing the merits and was not

intended to override the parties' contractual agreement to award attorneys' fees to a victorious

party. See Final Award at 21. The Panel invoked PaineWebber, Inc. v. Bybyk, 81 F.3d 1193 (2d

Cir. 1996), in which the Court of Appeals engaged identical logic on attorneys' fees:

> The Agreement provides that 'any and all controversies' shall be
> submitted to arbitration; there is no express limitation with respect
> to attorneys' fees. For reasons already stated, a choice of law
> provision will not be construed to impose substantive restrictions
> on the parties' rights under the FAA, including the right to arbitrate
> claims for attorneys' fees.

See Bybyk, 81 F.3d at 1202.

Finally, it should be noted that Qiagen's attempt to undermine the Panel's Final

Award on the merits by quibbling over the fee award is a red herring. The minor question of

attorneys' fees is extraneous to the weighty issues of patent and contract law addressed by the

Panel, and the decision on attorneys' fees provides no basis for revisiting the Final Award.

C. Denial of Leave to Amend

Qiagen argues that the Panel erred in denying Digene leave to amend its petition

to assert a claim that the assignment of rights under the Cross-License Agreement from IP to

Roche was invalid. Qiagen contends that the evidence would have shown Roche was not a

successor in interest to the agreement and, thus, had no right to sell any HPV-related "products."

Under § 10(a)(3), an arbitrator's refusal to hear evidence or denial of a procedural

matter may be grounds for vacatur where the movant shows a denial of "fundamental fairness."

See Tempo Shain Corp. v. Bertek, Inc., 120 F.3d 16, 20 (2d Cir. 1997); Max Marx Color &

Chem. Co. Emps. Profit Sharing Plan v. Barnes, 37 F. Supp. 2d 248, 252 & n.6 (S.D.N.Y. 1999).

"In making evidentiary determinations, an arbitrator 'need not follow all the niceties observed by

-22-

the federal courts.'"  Tempo Shain, 120 F.3d at 20 (quoting Bell Aerospace Co. Div. of Textron
v. Local 516, 500 F.2d 921, 923 (2d Cir. 1974)).  An arbitrator is not required to exhaust the
evidentiary record and thereby undermine the proceeding's efficiency; rather, the panel "must
give each of the parties to the dispute an adequate opportunity to present its evidence and
argument."  Tempo Shain, 120 F.3d at 20 (citation omitted).

    The Panel denied Digene's motion to amend, filed more than a year into the
arbitration, stating, "The delay occasioned by Digene in seeking to assert this claim at this time
could be prejudicial to Respondents . . . and inject new issues and complexities into the case that
might adversely affect and delay the fair, expeditious and efficient resolution of the present
dispute."  See First McCarney Decl. Ex. 18: Preliminary Hearing Order No. 5 dated Apr. 4,
2008, at 2.  Given the delay and the fact that the proposed amendment would have allowed
Digene to pursue two antagonistic claims, the Panel's decision was correct.  Moreover, the Panel
clarified that this denial had no practical effect on the arbitration because Digene could still
argue this assignment issue and present evidence relevant to the theory.  Thus, the Panel afforded
Qiagen the "adequate opportunity" to present its evidence required by the law of this Circuit.
Contrary to Qiagen's suggestion, the Panel did not fail to "rule on [an] issue upon which the
resolution of the parties' dispute depend[ed]."  Young Radiator Co. v. Int'l Union U.A.W., 734
F.2d 321, 326 (7th Cir. 1984).  By allowing Digene to pursue its argument without the formal
mechanism of an amended arbitration demand, the Panel came to a reasonable compromise that
allowed the arbitration to proceed without compromising fairness.

    Accordingly, Qiagen's petition to vacate the Final Award is denied.

III.   Petition to Confirm

        "Under the Convention, the district court's role in reviewing a foreign arbitral award is strictly limited: 'The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.'" Yusuf, 126 F.3d at 19 (quoting 9 U.S.C. § 207). "Normally, confirmation of an arbitration award is 'a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.'" D.H. Blair & Co. Inc. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006).

        Because this Court finds no grounds for vacating or refusing the Final Award, Roche and Gen-Probe's petition to confirm the Final Award in its entirety is granted. However, their application for attorneys' fees with respect to this confirmation proceeding is denied. In its Final Award, the Panel noted that "[a]ll parties agree that this case touched on 'complex areas of law,' with difficult questions that required 'skillful litigation.'" This Court agrees and cannot conclude that Qiagen, in attempting to vacate the Award, acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991).

## CONCLUSION

For the foregoing reasons, Petitioners F. Hoffmann-La Roche Ltd., Roche

Molecular Systems, Inc., and Gen-Probe, Inc.'s petition to confirm a final international

arbitration award (No. 09 Civ. 7326) is granted. Respondent Qiagen Gaithersburg, Inc.'s petition

to vacate the award (No. 09 Civ. 7396) is denied. Petitioners are directed to submit a proposed

final judgment by August 20, 2010. The Clerk of Court is directed to terminate all motions

pending and mark these cases closed.

Dated: August 11, 2010
     New York, New York

                                      SO ORDERED:

                                      WILLIAM H. PAULEY III
                                          U.S.D.J.

*Counsel of Record*

Peter J. Macdonald, Esq.
Wilmer, Cutler, Hale & Dorr, L.L.P.
399 Park Avenue
New York, NY 10022
*Counsel for Petitioner Gen-Probe, Inc.*

David McLean, Esq.
Latham & Watkins, L.L.P.
885 Third Avenue, Suite 1000
New York, NY 10022
*Counsel for Petitioners F. Hoffman La-Roche Ltd. and Roche Molecular Systems, Inc.*

David Bilsker, Esq.
Howrey, L.L.P.
525 Market Street, Suite 3600
San Francisco, CA 94105
*Counsel for Respondent Qiagen Gaithersburg, Inc.*

-25-

Richard William Beckler, Esq.
Howrey, L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
*Counsel for Respondent Qiagen Gaithersburg, Inc.*

James Gerard McCarney, Esq.
Howrey, L.L.P.
601 Lexington Avenue
New York, NY 10022
*Counsel for Respondent Qiagen Gaithersburg, Inc.*